CRUZ-CANSECO Good morning, Your Honors. John Lemon for the appellant. Excuse me, Mr. Ramiro Cruz-Canseco. I would like to reserve five minutes of my time for rebuttal. Mr. Cruz's conviction should be reversed for several reasons. I'd like to begin with the improperly excluded grand jury testimony of the APOC custodian. This testimony was essential to Mr. Cruz's defense for a couple of reasons. First, the testimony by the APOC custodian before the grand jury was that Mr. Cruz was apprehended very close to the primary border fence. That was essential to Mr. Cruz's defense of trial, which is that he was never free of official restraint. The second reason that this testimony was important is because, based on the testimony the government introduced as to where the border begins, it was completely plausible that Mr. Cruz had ever actually entered the United States if he was arrested just in front of the primary border fence. So this testimony by the APOC custodian before the grand jury... For any reason other than the fact that a surveying error of five feet is more plausible than a surveying error of 50 feet? I'm sorry, I didn't hear the comment. Well, I'm thinking, why is it that which fence he was next to makes a big difference? Because one's supposed to be like two feet from the border and the other's supposed to be 50 feet from the border? Well, I think a layperson going out to this area, this is not... Obviously, I'm not making an argument that potentially Chula Vista is in Mexico or anything. But a layperson going out to this area sees a double fence line. And the second fence, the northernmost fence, is much taller than the primary fence. And I think a layperson looking at this area is going to think that the secondary fence could very well be the border. Now, the government introduced unnoticed expert opinion from the arresting agent in this case as to where the border begins. And Your Honor is exactly right. It's much more plausible than a surveying error or that simple meandering of the fence between the monuments that that fence, that primary fence, the shorter of the two fences, is in Mexico in some places. And, yes, Your Honor is exactly right. If Mr. Cruz was arrested very close to the primary fence, it is much more plausible that he's in Mexico at that point than it is if he's arrested 50 yards north. So that's why that testimony was pivotal to the defense. What evidence is that he was in Mexico? Well... I mean, there was evidence that he was not. That, I mean, you dispute the evidence, but there was evidence. But what evidence was it that this was in Mexico? Well, the testimony that I objected to at trial that the government introduced to show that he was in the United States was essentially expert testimony proffered by an unqualified witness. And I don't think there was any evidence to indicate that he was in the United States other than the circumstantial evidence that there's double fences being patrolled by the Border Patrol. There was... This is not an obvious international... So you've got... But you're switching issues on me now. You've got your objection to the lay expert testimony or the lay opinion testimony about where the border is. I understand your objection. If you went on that, you win. That's fine. But assuming that, holding that stationary, saying that's the evidence in the record, we have evidence that, in fact, the entire border is two or three feet south of the southern fence, the first fence. Okay. Now let's talk about this evidence that you say was excluded. And I'm trying to figure... I'm wondering how it would have helped your client persuade the jury. Okay. Because according to testimony in the record, which we've already said we're not going to dispute right this minute, both fences were within the United States. So what does it matter if he was observed at this fence or he was observed at that fence? Okay, Your Honor. Actually, I do have an answer to that. The testimony from Border Patrol agent Maldonado, who was essentially the unqualified expert, but, again, assuming that that was properly introduced or that it's reliable, was that these monuments actually demarcate the international border. It's not like there's a river there or anything. There are obelisk monuments. I asked him on cross-examination, I said, what is the... I said, there's at least a mile between these monuments. And his response was, more, I'm not sure how the monuments work. That was his testimony. He doesn't know how the monuments work. And then I also elicited from him on cross-examination that the primary fence meanders between the monuments and that, in his words, the primary fence goes with the contour of the land. Now, that, I think the logical inference here is that at some point that fence is not going to be in the United States. I mean, the obelisks are more than a mile apart, and the fence is meandering between them with the contour of the land by the government's own admission. It stands to reason that at some point that fence is going to meander into Mexico and then back into the United States. The fence itself does not demarcate the international border. The obelisks do. And that was the testimony of trial. So that's why the testimony by the grand jury witness was so pivotal because it makes it much more plausible for me to argue official restraint, and it makes it certainly much more plausible for me to argue that my client was never in the United States. The government, of course, for their part, decides to completely distance themselves and disavow that testimony, and it was simply a party admission under 801D2. Beginning with 801D2B, it's an admission that the government manifested their belief that it was true. And for that, I cited United States v. Morgan. That's one point. You say that if the testimony had not been excluded, you'd have an admission by the government that he was arrested at the first fence rather than on the north side of the first fence rather than on the south side of the second. Yes. Okay. And that, you say, is relevant to your argument that he wasn't in Mexico. Anything else that that or he was still in Mexico? He was still in Mexico.  Yes, Your Honor. What? The official restraint defense. The idea that the idea that the evidence was not that he had been under observation the entire time. The evidence is that the first time he saw him, he was already over the fence. Right. And, Your Honor. So he wasn't under official restraint the entire time. They don't know how long he'd been there. Well, the government's position was that they didn't know how long that he had been there. However, my argument would have been that if he's approached just as he's just north of the primary fence. No, they said he was walking along the primary fence. Walking eastward or westward along the fence. Right, Your Honor. And I understand that. Well, what I'm saying is my argument to the jury, the illogical inference, is that if he's seen walking just north of the primary fence, they had to see him coming in. And if they just omitted that from the report. Now, it's very. And the government saw a problem with that, too, obviously. Because the testimony at trial was that that never happened. And that he was lost in a patch of fog for 15 minutes. And by the time they actually arrested him. No, they didn't say it never happened. They said that. They said they saw him walking along the fence. Right. And then they said they lost him in the fog. But let's assume all of that's untrue. They just saw somebody walking along the fence. First time they see him, he's in the country walking alongside the fence. Well, and again, the logical inference, the argument I was going to make, was that he was apprehended immediately after entering the United States. They had to see him come in if he's apprehended on the primary fence. And that they simply omitted that from their testimony. It's, again, much more plausible for me to make that argument based on whether or not they saw him enter. Than it is after the government's testimony. Which is that, the agent Maldonado's testimony. Which is that he was lost in the fog bank for 15 minutes and apprehended 50 yards north. I'm not sure I understand. What is the significance of the fact that they saw him enter? Paint me the scenario you would have painted. I guess the fence has gaps? Well, I don't think there were. Time over the fence? There was no testimony as to there being any gaps in the fence that I recall. But somehow, since he's near the fence, you would say they must have seen him crossing the fence somehow. Right. And so what? Well, I think if this Court assumes that constant surveillance is the only way to be under official restraint, which I'm obviously contesting that as well. But the district court certainly instructed the jury that constant surveillance was the only way for someone to be under official restraint. Then the significance of the entry is that, to be under constant surveillance, he has to be seen coming in. What I'm saying is that I could logically argue they had to see him coming in based on the testimony that was brought before the jury. The kids' question was, assume they saw him coming in. Right. Then they said, so what does that lead you to? Well, then he's definitely under official restraint. If they see him coming in and they apprehend him immediately under this circuit's multiple decisions, he's absolutely under official restraint because he's under constant surveillance the entire time. That's why that's important. If somebody walks across to the border station, and as he's crossing, they say, stop right there, show me your documents. It turns out he doesn't have a visa. That's under official restraint? Correct. And that's what the Court of Appeals does. It does that for purposes of being found in. Now, typically in southern districts, the government would charge that as what Your Honor just described as an attempted illegal entry, and then official restraint doesn't matter. But for a found in, which is what this was, they charged that he had been found in the United States. He has to, according to Pacheco-Medina, have been free to go at large and mix with the population. And Pacheco-Medina held that this Court construes official restraint broadly to include constant observation. So, yes, if the agent saw him hop over the fence and arrested him immediately, then he's not found in. He may have attempted to illegally enter, but that's not what he was charged with. So what you must show is that they observed him crossing the fence somehow. Well, that would have been my argument to the jury. And, again, it would have been much more plausible for me to make that argument had I been able to introduce the testimony of the grand jury witness. There was no evidence to that effect. There would have just been an inference you would have wanted the jury to draw. The evidence would have been that he had been arrested just right on the primary fence. I would have argued, obviously, they had to see him come in because he didn't get very far. But also there was not sufficient evidence that just north of the primary fence was even in the United States based on the testimony that the government introduced. But, again, I think the key point here is that I should have at least had the opportunity to make the argument. It might have been an uphill battle, but — I mean, let's say somebody is crossing through a border station. And at that particular moment, the district crossing the border station, the agent in charge gets a telephone call or, you know, so turns around to speak to another agent on another matter and then doesn't see somebody go through and then says, I didn't get a chance to check your papers. I think you would view that as having not been on the primary street. Well, that's kind of — Your Honor is referring to a port of entry? Yes. I think — I mean, the fact that you know somebody must have crossed through is different from saying I have actually observed the person crossing through. The inference that if you didn't — let's say nobody officially actually sees him do the crossing, but you know the only way he could have gotten there was by having crossed. That's not enough. Right. Well, I think — They actually have to see him from the moment he — I think that's a difficult question because, frankly, I think there's an inter-circuit conflict on that. I think that there are at least three cases — We don't have inter-circuit conflicts. Well, I think that there's certainly some discrepancy. In fact, the district court alluded to that when she — when she stated that she would appreciate some guidance from this court as to how to define official restraint. There are at least three cases from this court holding that constant surveillance equals official restraint. But in each one of those cases, there's a momentary break in the surveillance. And then there are several other cases where there's a momentary break in the surveillance, and this court has held that that is sufficient for the person no longer to have been under official restraint. So I do think that there's a certain disconnect there. Of course, I've also made the argument that the fact that my client is standing behind this giant fence is per se official restraint. He didn't know how to get around it. He asked the agent for help in getting around it. He told the agent he couldn't get around it. And so pretty clearly, he couldn't get into the United States. He's restrained by this giant fence, and he's under — It doesn't matter. I mean, if you're talking about the second fence, it doesn't matter. That one's clearly in the United States. And whether he can cross the fence or not, he is in the United States at that point. He's in the United States, but he's not free to go at large and mixed with the general population. So he's still under official restraint. And that's — So when you say he's not free to go, he's not free to go because there's a fence stopping him? Exactly. The — the Chucklemadina side of the Third Circuit case, Yang v. Moggins — You know, I would think you're right in that argument, except for our case. Whatever it is, the case with the fence and the wall.  Martin Placencia. Yeah. That — I mean, it's not a very persuasive case, but it's the case. And it don't — it pretty well disposes of the argument. Well, Your Honor, I think Martin Placencia is distinguishable on his facts. And I think that the actual recitation of the facts in that case are very dissimilar from what happened here. Martin Placencia, he crawled under an eight-foot fence and then he got over another fence somehow and then went 50 yards north and was scaling a wall. That's right, but it's not just the wall. It's what the court said. And Judge Kaczynski will assure you that it's not dictum. It's part of the reasoning. The — Well, maybe it was Reinhardt opinion. The court said that going through the fence and the wall, they treated the fence as if it was the same as the wall, that even though those may be barriers that he needed agility to overcome, that's not what we mean by not being free, because he could surmount those if he were agile enough. Right. But that's — I think that that's at least one of the distinctions here. My client is clearly not agile enough. He's only 5'2". Well, does whether you're there in the United States and free to go depend on whether your age, your sex, your physical condition, or does it depend on the nature of the barriers? I think it's a jury question as to whether you're free to go at large and mix with the general population. And Martin Placencia obviously was — Free has two meanings. One of them is free from official restraint. And then it's free in the sense that you have the capacity to get there. If you're standing on one edge of the Grand Canyon, you know, you're free to walk across. But, you know, unless you can fly or, you know, something, you're going to fall. Well, I think it — I think the definition means free to mix with the general population of the United States. And I think Martin Placencia was further north than my client. And he was agile. He was getting around and mixing with the general population. My client was prevented from going north by the fence. And I think that's the principle. So if Mr. Martin Placencia had been there instead of your client, he would have been free to go because he was agile enough to get over the fence? If he had been climbing over the fence, then I think there's an excellent argument that he was exercising his free will within the United States. But also Martin Placencia was further north. And that's — he was at least 50 yards into the United States, which my client was not. But still within the confines of a port of entry. Yes, he was still within the port. But, Your Honor, I would add one other thing, which is that the Third Circuit case, Yang v. Moggins, where the Third Circuit actually referenced Martin Placencia and specifically said that they declined to follow it, that was cited with approval by this Court in Pacheco-Medina when this Court held, again, that the definition is whether someone is free to go at large and mix with the general population. I see I only have two minutes left. If I'd like to reserve the remainder for rebuttal, if possible. Thank you, counsel. Thank you. Judge Eastwood. Thank you, Your Honor. It's a wonderful panel. May I please the Court? Michelle Jennings on behalf of the United States. Pellin has raised six issues. I'd like to begin with the issue regarding the exclusion of the grand jury testimony. Pellin alleges that a Sixth Amendment right to compulsory process was violated. However, that occurs only when a defendant is arbitrarily deprived of testimony that would have been relevant and material to the defense. That showing has not been made. He claims that this testimony was exculpatory. However, regardless of the fact of whether he was actually apprehended at the primary fence or at the secondary fence, he was apprehended not having been seen entering the United States. So it does not, in fact, address his or assist in his official restraint argument. Additionally, it was Agent Maldonado's report on which Agent Ramirez based his testimony. He was clearly a summary witness, and it was – The argument is that by presenting this as the basis for an indictment, that the government adopted that position and that it can't now disavow it at the trial. That's the argument. Do you disagree that the government advanced that position to the grand jury, the position set forth in Agent Maldonado's written report? I do, Your Honor. The U.S. Attorney's Office puts any manner of witnesses before the grand jury, criminals at times, cooperating witnesses. And the government doesn't stand behind that testimony? Your Honor, we don't believe that the United States adopted that testimony simply – This is a government witness, not a criminal. It also is the only witness. It is the only witness, Your Honor. And he's a government agent. But the government – I'm sorry, Your Honor. No, no. He was a government agent. He was an agent of the Border Patrol, yes, Your Honor. That's not the government? No, Your Honor. He doesn't work for the government? His paycheck is signed by the federal government, absolutely, Your Honor. But you would say he's not a government agent? I would say he does not – he is not an agent or servant such as may bind the United States as a party, no, Your Honor. Why not? Because he is thought to be an independent witness. He is an agent of the Border Patrol as opposed to an agent per se of the United States in a criminal case. And the government believes that there is a distinction. Well, whatever it is – Why don't you explain it to me because I don't understand at all. Well, Your Honor, Agent Ramirez – Who would be the sort of quintessential government agent in a – for the United States in a criminal case? With the capability of binding the United States, the assistant U.S. attorney. Oh, but you're so wrong about that. The United States is represented by the Department of Justice. The Department of Justice, if anything, can't be an agent of the party because it is the government's lawyer. It is the government's lawyer. How could the lawyer be the agent – if the lawyer were an agent, he'd have to disqualify himself and the whole Justice Department representing the United States. Well, Your Honor, for purposes of 801, I believe that the case law from other circuits, I believe, is clear that the assistant U.S. attorney or the prosecutor may bind the United States in its representations. May very well bind in court, but for purposes of hearsay, isn't an employee who acts for the United States vis-à-vis this particular transaction exactly what 801 contemplates? No, Your Honor. The government's position is that it's not. Furthermore, he was clearly a summary witness. Well, I have to say a little bit more than that. I mean, the government can be wrong and has been wrong in the past and is probably wrong in this case. Why on earth would somebody who is paid by the government to perform work for the government in the very area – I mean, how else does the government act vis-à-vis the border enforcement except through its work with all agents? Well, Your Honor, the government's position is that Agent Ramirez was placed in front of the grand jury as an independent witness. He was not told by the United States what to say, how to say. He was told, review Agent Maldonado's report. Who told him that? I'm sorry, Your Honor? You said he wasn't told by the United States. Who told him to review the report and report what it said? Well, from the record, the assistant U.S. attorney that appeared in front of the grand jury asked him if he had reviewed Agent Maldonado's report. He indicated he had. And how did he get the record? How did he get Maldonado's report? That's not in the record, but my assumption would be that the grand jury assistant provided that report or he received it through the Border Patrol prosecutions team, through another Border Patrol agent, that is, Your Honor. I see. So somebody from the United States gave him the report and said, this is one of our reports. Either a Border Patrol agent or the assistant U.S. attorney herself. It wasn't the mafia that gave it to him. That's correct, Your Honor. It wasn't maybe defense counsel who said, hey, when you're going into the grand jury, would you read this for me as a favor? Was it defense counsel? That's absolutely correct, Your Honor. It was somebody who gets a green paycheck. That's correct, Your Honor. And why is it that he did this on behalf of whoever asked him to do it? Was he just sort of having fun? No, Your Honor. He was called by the United States. Did he get paid his job the day he went to the grand jury? Or did he have to take a day off as a vacation day? He was paid, Your Honor. He was paid? Why? Was he – why was he paid? He's not out patrolling the border. That's correct, Your Honor. Was he doing work for the government? Yes, Your Honor. Okay. He was called as a witness, as an – As a custodian of records, right? In addition – He was called as a custodian. How did he come to be custodian of records? Who told him, hey, you're the custodian of records? Your Honor, I believe the record is silent on that. Presumably, the assistant U.S. attorney who presented the case to the grand jury – You know, the Justice Department may have a lot of powers, but surely it cannot decide who within another federal agency is a custodian of records of that agency. That's correct, Your Honor. Okay. So it must have been somebody that Mr. Ramirez works for who made him custodian of the record. Yes, Your Honor. Okay. Somebody who works for the government, too? Presumably, Your Honor. In the course of that person's employment? Yes, Your Honor. And Mr. Agent Maldonado, when he filled out the report, was he doing it as sort of a exercise on Sunday morning just to have fun? Or was he doing it – was he getting paid for that? He was being paid, Your Honor. And he was doing it in the course of his employment? Of course, Your Honor. So I don't quite get it. How is this possibly anything but a non-hearsay under – I mean, it's two levels of hearsay. There's Maldonado's statement, report, and then there is Ramirez's statement, reading the report to the grand jury. So when you get to the trial, you're now dealing with two levels of hearsay, but – of potential hearsay, except that they're all statements of government agents doing their job as government agents pursuing two directions from other government agents. That's correct, Your Honor. And the government's position is that there is a difference. The Border Patrol, former INS, any number of government agents do not speak with the authority to bind the United States of America in a criminal prosecution. But more importantly, Your Honor – But that's not the test. The question is not whether they speak and bind the United States in a criminal prosecution. That's what lawyers do. In a criminal case, lawyers can bind the United States. The question is whether, for purposes of hearsay, they're speaking during the course of their employment. And do you have a single case from any circuit that says that somebody who works for a federal agency and speaks in the course of his employment is not an agent for purposes of a hearsay rule? No, Your Honor, but I don't believe I found a case where it says that he does bind the United States as a party. The closest is United States v. Wu. That's a Second Circuit case. But the closest the Second Circuit came is finding that grand jury testimony may well have been admission. However, in that case, the 403 analysis was such that it was properly excluded. And that's what occurred in this case, Your Honor. Agent Ramirez testified, and there's no ambiguity in the record, based solely on Agent Maldonado's report. He had absolutely no personal knowledge of what went on January 13th. At trial, Agent Maldonado was cross-examined not once, not twice, but three times. Okay. So the question is the – you know, there's no question that he was just reading the report. And at trial, they talked about whether the report – you know, Agent Maldonado, in effect, disavowed the report. But their argument, as I understand it, is that by obtaining the indictment on the basis of the report and representing to the grand jury that this is what happened, the government adopted the report and adopted the testimony of the grand jury witness. And I think that's a different issue than Judge Kaczynski is asking you about. And I don't want to, you know, abandon that issue if he's not true. But I – I think I've gotten as much as I'm going to get. Okay. But you disagree with the argument that the government presenting – telling the jury, grand jury, here is what happened, and the indictment isn't – hasn't adopted that testimony as its position? I do disagree, Your Honor. And in fact, that was not the instruction given to the grand jury. The witness was presented by the United States Attorney's Office, much as, again, any witness, a civilian, a criminal, any number of witnesses are presented. At the conclusion of that presentation of testimony, the grand jury assistant said, you have the law, you have the facts. That was the instruction. It wasn't indict, here's the indictment. Now, of course, a draft indictment was presented to the foreman of the grand jury, but it was for the grand jury as an independent body to determine whether or not to indict this person. Of course it was. It was up to the grand jury to determine it, but the government took a position before the grand jury. The government took the position, I assume, that this is what happened, that the agent did these things. If the government – let's say the United States Attorney has a witness that's willing to say X, and the United States Attorney knows, based on independent evidence, that X is not true, either the witness is lying or the witness is just confused, may the United States Attorney, Assistant United States Attorney, ethically present that witness to the grand jury? No, Your Honor. If the AUSA knew the witness was going to lie. So to the extent that the Assistant United States Attorney put the witness before the grand jury, it was making an implicit professional ethical judgment that it believed that testimony to be true. That it did not believe the testimony was false. Absolutely, Your Honor. Of course, the Assistant U.S. Attorney had, just as Agent Ramirez, did not. You think they did not believe it to be false? It's different from believe it to be true? Let's say the government has a witness. A witness comes in and says, the moon is made of green cheese. And the Assistant United States Attorney says, you know, I don't really know. I've never been to the moon. I look up sometimes and it looks sort of like it could be green cheese or blue cheese. I don't have any knowledge one way or the other. Well, can the ‑‑ can she put it, send the witness before the grand jury and say, we don't know whether they're telling the truth or not, but you go ahead and if you believe, you know, we'll put it under the circumstances. Does that ever happen? Can the United States ever put them on witness? Or can it even ethically put on a witness unless it is convinced of the truth of its statements? I think in your hypothetical, Your Honor, there is a very ‑‑ the AUSA in that case would have a very good reason to believe that it wasn't true. In this particular case ‑‑ Well, let's see the ‑‑ that's something else, and the AUSA is simply agnostic on the point. Does not know. Could be true, could not be true. Could be true, could not be true. What do the U.S. Attorney's manuals say on that point? Do you present a witness to the grand jury when you have doubts as to whether it might ‑‑ the evidence might be true? You don't know it's false, but you have doubts. Your Honor, I would ask for further clarification what my doubts would be based on. I believe that the assistant U.S. attorney has an obligation to, of course, never knowingly present false testimony or testimony that the AUSA has reason to believe may or may not be true. I think definitely. So in that case, if that's the standard, then by putting on the witness, it means you do not have doubts that the evidence may not be true. That's what putting on the witness means. You have filtered it through your ethical obligation. You're not putting it in front of the jury. You're suggesting you do not have doubts as to the truth of that testimony. I agree, but I believe that there is a difference between not doubting the testimony and adopting it for the United States of America as a party in a criminal case, Your Honor. I believe there is a distinction. There may be a difference, too. I mean, you may present 20 witnesses in a case. Some of them may tell different stories. You may not know which are true. Yes, Your Honor. But you may present all the relevant evidence. Yes, Your Honor. I don't think the argument is that you necessarily are bound by what every grand jury witness says. I think, as I understand the argument here, and the facts here are, there's one witness who gives the government's case and the theory of the case. Yes, Your Honor. And the question is, does that bind you in any way? If you represent to the grand jury, here is what the government's case is through a government witness. Does that bind you in any way? Are you adopting that position? Because that's the heart of your case to the grand jury through a government witness. The government does not believe that simply by virtue of the fact that the witness is also a government employee, that binds or makes it a party admission in the trial level, Your Honor. But most importantly, the district court did a 403 analysis in this case and determined that it's collateral under 403, it's absolutely confusing to allow this grand jury testimony in, and it's time consuming. As Mr. Lemon wrote in his brief, the judge did a very exacting 403 analysis. And in that case, the determination was made that clearly the differences between Agent Maldonado's report and Agent Maldonado's trial testimony, where it was clear that there was a discrepancy between the report and his trial testimony. There was no harm. I'm sorry. How would they have known that? I'm sorry, Your Honor? How did they know that? Through the cross-examination, the very thorough cross-examination conducted by Mr. Lemon regarding the discrepancy. And it was based on the report? Based on the report. He was asked about statements he made in the report. He was. The report was marked as an exhibit, and it was referenced, I believe, it was in the first opportunity for cross-examination. Each and every of the discrepancies noted in Mr. Lemon's brief were discussed. And the grand jury asked, I mean, not the grand jury. The jury asked if it could see the report while they were deliberating, and they would tell no because it wasn't introduced in the evidence. It was simply an exhibit, right? That's true, Your Honor. That's true. And Agent Maldonado conceded each and every occasion where Mr. Lemon indicated X, Y, or Z facts were not in the report, Agent Maldonado absolutely conceded, no, that's not in my summary report. Under a 403 analysis, the exclusion of this grand jury testimony was absolutely appropriate as the district court properly found. I would like to speak. I suppose that would depend to some extent on how material it was and how significant. And that's where we started, I think, with this, is what does it prove? And you don't think the case is really any different if he was arrested at the first fence. That's correct, Your Honor. We don't. So could we decide this case on the basis that he was arrested at the first fence, as the report states? I don't believe that it would change the outcome one bit. The fact is he was found already within the United States. Agent Maldonado had asked, and that's not controverted, at trial. He was walking eastbound along the primary fence. That was in his report. That was discussed at trial, that that was where he was originally found. It would not change the analysis one bit, because he was not, not having been seen either be physically within the grasp of the United States or under the surveillance of the United States when he physically entered the country, the doctrine of official restraint simply would not apply. Unless the second fence constitutes official restraint. That's correct, Your Honor. However, government's position is that multiple layers of security, of deterrence, do not constitute, as Mr. Lemon suggested, some second border. Were that the case, then, what if I ---- Not a second border, but if the test is are you free to go and mix with the general population, then two fences, forgetting our prior case, two fences would appear to restrain you from being free to go mix with the general population. Well, but ---- Then you got over the second fence. Well, but for the fact that the general population is allowed between those two fences is ---- How did they get there? Did they walk? The testimony at trial, at record 146, indicates that there are gaps in the secondary fence, and that, in fact, Agent Maldonado has seen people run through those gaps. He's seen people jog in this area. He's seen people bike in this area. And it's perfectly legal for members of the population at large to do so. For that reason ---- Apparently, Mexicans also go through that area and don't get arrested normally. This is really a bizarre case. I mean, this fellow was arrested only because he refused to go back. He wanted help to get over the second fence from the Border Patrol. For some reason, the Border Patrol didn't give him a boost. That's right, Your Honor. But if he had just been walking along that border and doing ---- picking up cans, doing whatever he wanted, like other Mexicans apparently do regularly, which is occupy the area between the two fences, he would not have been arrested. You know, that was the testimony at trial. For policy reasons, based on sheer mass numbers of arrests that would incur, he wouldn't have been arrested. You're absolutely right. Because there are so many Mexicans in between the two fences. You're right, Your Honor. The position that Mr. Lemon would have us take is that this ---- Are there lemonade stands? Not to my knowledge, Your Honor. Curious? Not at this point. However, if Mr. Lemon's position is adopted, this would become basically a hands-off ---- No man's land. That's right, Your Honor. A duty-free zone, it sounds like to me. That's right. Sounds like a way to boost Southern California and Mexican economies at the same time. The duty-free zone between them. Your Honor, see, I am over my time. I'd be more than happy to answer any additional questions. However, if not, I would thank you for your consideration. Thank you very much. Your Honor, I'd like to begin, or Your Honors, I'd like to begin with the last point that Americans are allowed to go to ride their bikes or whatever. That's simply not credible testimony. In retrospect, I should have done a more thorough cross-examination on this witness, but he did testify that these gates are locked. If you're coming from the south to this area, first of all, no one in their right mind would want to vacation or picnic or exercise in this area. It is already a no man's land. And Agent Maldonado told us that typically the people he sees in that area are what they refer to as ragpickers, which are these unfortunate homeless Mexican people that come over the primary fence and look for basically junk in between the two fences, and then typically they send them back to Mexico. No one on their worst day would want to go to this area to recreate. It's not like there's a jogging facility or something like that. It was frankly absurd. The fences are locked. The agent testified that sometimes their locks become compromised, but he was clearly referring to undocumented aliens and alien smugglers getting the keys, not to Americans coming from the north wanting to recreate there. But this is a no man's land. That's exactly what it is. It's like a giant lobster trap, and that's where my client was. I'd like to go back to the issue. He had a chance to go back, and he didn't want to tell you. He likes the United States. He spent his entire life here, and he could very easily have just gone back. It's not like he would spend a little more time here. Yes, he is, and it is ironic. But with respect to the issue of the admission, I did want to point out that the Morgan case which I cited, which held that when the government authorizes its agent to present his sworn assurances to a judicial officer that certain matters are true and justify the issuance of a warrant, the statements of fact or belief in the public officer's affidavit represent the position of the government itself, not merely the views of its agent. That case is particularly important because the government cited it with approval in their brief at page 24. And that's exactly what happened here, except we've got even a heightened issue of reliability for the adoption. The government presents the witness to the grand jury. They tell the grand jury that he works for the Immigration Service and he's here to testify about my client. He's under oath. And the direct testimony is enlisted by the government. Now, I'm going to move on to the 403 analysis because I'm running out of time here. First of all, I think the government waived that argument because they didn't raise it in their brief. But more importantly, this evidence, this testimony to me ---- I think it's more important than the waiver. I'm sorry? Well, you're right. It's not more importantly. But in addition to the waiver, this evidence was absolutely critical to our position because, first of all, I impeached Agent Maldonado multiple times with his report, but that just came in for impeachment. Under the Federal rules of evidence, it doesn't come in for the truth, as opposed to in the California rules where a prior and consistent statement always comes in for the truth. This testimony from Agent Ramirez in front of the grand jury would have been introduced to the Petit jury for the truth of the matter asserted, and it was the entire theory of the defense. Which is that my client was arrested just north of the primary fence. Secondly, it serves to further impeach Agent Maldonado, who attempted to distance himself from his report. He referred to it as a summary report. But doesn't this all depend, in the end, on whether it would have been a crime had he been arrested where Agent Maldonado's report says he was and in the manner in which it was? If the fact that he was arrested... I mean, if he was arrested walking along the southern fence, the first fence on the northern side, if he was arrested there and if Agent Maldonado first observed him walking along there, if that constitutes a crime, because, A, it's on the right side of the border, the north side of the border, B, he didn't see him enter, and that's a requirement, if that's the conclusion, then there's no real harm, right? Well, no, Your Honor, I think that two things, again, are pivotal about the grand jury testimony. Where he was arrested, first of all, the government did not introduce reliable evidence that someone standing just north of that primary fence is in the United States. If we decided that, that location was in the United States. Well, I would have at least been able to argue to the jury that there's not sufficient proof, beyond a reasonable doubt, that standing just north of that primary fence is in the United States. I would have been able to argue that had this grand jury testimony been admissible. So it was essential to the defense. Also, with respect to official restraint, admittedly, Your Honor, the government's going to stand up and say, look, there's no evidence that anyone saw Mr. Cruz climb over the fence. Therefore, he wasn't under constant surveillance. But that's a jury question. And I would have been able to stand up and say, look, we've got inconsistencies in their testimony. There's problems with the integrity of their investigation. Kennedy. Did you not argue to the jury that he was actually arrested at the first fence rather than the second? I think I tried to. But unfortunately, the district court had, again, not allowed me to introduce the statement by the party opponents. So therefore, it wasn't evidence that he was arrested on the primary fence. There was no evidence of that. And the government actually addressed that in their closing and said, you've heard Mr. And there's no evidence of that. The government absolutely seized upon the fact that this admission was not entered into evidence. There was — it didn't come in for the truth. And that's why it was absolutely essential. Finally, with respect to Agent Ramirez, he's the AFOP custodian. He's essentially the investigating agent. He sat with the government throughout the trial. And the fact that he's going to testify to something that the government is later going to say is not true goes to the integrity of their investigation. And so this is — there are — there are — this is essentially our whole case. This can't be collateral. It can't be excluded under a 403 analysis. This was Mr. Cruz's defense. He was arrested along the primary fence. He was under official restraint. And they couldn't prove that he had entered the United States. And we couldn't do that without the grand jury admissions. Thank you. Thank you, counsel. The case to Farragut will be submitted. The Court will take a brief recess.
judges: Reinhardt, Kozinski, Clifton